**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **POOR PEOPLE'S ECONOMIC HUMAN RIGHTS CAMPAIGN,** | : : : | **No. 16-cv-3281** |
| **Plaintiff,** | : : | |
| **v.** | : : | |
| **CITY OF PHILADELPHIA,** | : : | |
| **Defendant.** | : : : | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION**
**FOR PRELIMINARY INJUNCTION**

## I.   INTRODUCTION

This First Amendment action for declaratory and injunctive relief challenges the decision of the City of Philadelphia ("City") to refuse to grant a permit for *any* demonstration on *any* street in "Center City" during the five hours of each weekday that the City considers "rush hour." Pursuant to this policy, Plaintiff Poor People's Economic Human Rights Campaign ("PPEHRC") has been denied a permit to march down Broad Street from City Hall to FDR Park, across from the site of the Democratic National Convention, on the afternoon of the opening day of the DNC, Monday, July 25, 2016.

The City's policy is facially unconstitutional because:

(1) it cannot survive the strict scrutiny applied to content-based restrictions on speech.

The refusal to grant permits for political demonstrations on Center City streets during "rush hour" while at the same time granting permits to close the same streets during

the same hours for block parties, restaurant promotions, and other commercial and

civic events, makes the City's ban on demonstration permits a content-based

restriction on political speech that cannot survive the strict scrutiny applied to laws

that favor one type of speech over another; and

(2) even if the City's refusal to issue permits for morning and late afternoon marches is

viewed as content neutral, it cannot survive the intermediate scrutiny applied to

content-neutral restrictions on speech.  As the Third Circuit made clear this month,

"[t]o meet the requirement of narrow tailoring, the government must demonstrate that

alternative measures that burden substantially less speech would fail to achieve the

government's interests, not simply that the chosen route is easier."  *Bruni v. City of

Pittsburgh*, No. 15-1755, --- F.3d ----, 2016 WL 3083776, *10 (3d Cir. June 1, 2016).

The City has available far less burdensome alternatives that have been *proven* to

protect its interests in protecting the flow of traffic and public safety.

PPEHRC therefore asks this Court to issue a preliminary injunction enjoining the City's policy

against marches in "Center City" during "rush hour," and ordering the issuance of a permit for

PPEHRC's march.


## II.  PROCEDURAL HISTORY

This action was commenced by Complaint filed June 23, 2016.


## III. STATEMENT OF FACTS

PPEHRC is a multi-racial, intergenerational movement made up of poor, low-income,

and homeless families across the country.  Its goal is to eliminate poverty.  On the opening day

of the Republican National Convention in 2000, PPEHRC and thousands of poor residents of the

city marched from City Hall to the Wells Fargo Center in order to confront the nation's political leaders with the necessity of taking action to address poverty. PPEHRC believes that the plight of the poor in Philadelphia has only worsened since 2000, and PPEHRC and its members seek to repeat their march from the seat of Philadelphia government to the doorstep of the Democratic National Convention on its opening day to confront Democratic Party leadership with the continuing failure of the government to address the suffering of poor people.

### The DNC

Beginning on July 25, 2016, the City of Philadelphia will host the 2016 Democratic National Convention ("DNC" or the "Convention"). The Convention itself will take place at the Wells Fargo Center in South Philadelphia, approximately 3.5 miles south of Center City. It is one of several large venues to the east of Broad Street in South Philadelphia that, collectively, are known as the Sports Complex.

The Wells Fargo Center is not near any residential or business neighborhoods. It does not attract any pedestrian traffic, except when there is a sporting or other event at the Center. Most people reach the Wells Fargo Center by car or by the SEPTA Broad Street Line (the subway), which terminates at AT&T Station at Broad and Pattison.

Apart from the other venues that make up the Sports Complex, the only other venue in the neighborhood of the Wells Fargo Center is Franklin Delano Roosevelt Park ("FDR Park" or the "Park"), a large park located on the west side of Broad Street.

The City has committed to providing certain amenities for protesters in FDR Park, including portable toilets, misting stations, and water. The United States Secret Service has stated that it intends to build a fence along the west side of Broad Street to prevent protesters in the Park from entering the portion of Broad Street outside the Wells Fargo Center.

Most of the Convention activity at the Wells Fargo Center will occur during the evenings of July 25-28.  During the day, DNC delegates and associated visitors will be attending meetings and other events spread throughout Center City, including at the Pennsylvania Convention Center at Broad and Arch Streets.

PPEHRC and its members want to march from Center City, where they will be seen and heard by both visitors and Philadelphians alike, down Broad Street to FDR Park across from the Wells Fargo Center.  They want to start their march at 3 PM on July 25, which would enable them to reach FDR Park approximately the same time that the DNC formally starts inside the Wells Fargo Center.  PPEHRC anticipates that it will have about 500 participants in its march.

### The Ban on Morning and Late Afternoon Marches in Center City

The City of Philadelphia has promulgated regulations that require a permit for any protest, demonstration, or march of 75 or more people.  The process for obtaining such permits is set forth in the Regulations Governing Permits For Demonstrations on City Property ("Demonstration Policy") issued by the Office of the Managing Director ("MDO").  The Demonstration Policy requires that the City grant or deny an application within two business days of the receipt of the application, which period the City may extend for up to two more business days if the proposed event is more than 20 days in the future.

It is a violation of City regulations to demonstrate without a permit where one is required. Regulation Governing Permits for Demonstrations on City Property (attached as Exhibit H), § 2. Over the last month, PPEHRC's counsel has repeatedly asked the City to confirm that it will not take action against protesters who participate in unpermitted marches and demonstrations during the DNC, but the City has declined to offer such assurances.  On June 16, 2016, when asked by the Philadelphia Inquirer whether protesters without permits would be arrested, Mayor Kenney

said, "Probably not but again we encourage them to get a permit . . . ."  PPEHRC and its

members marched down Broad St. without a permit in 2000, under express threat of arrest from

then-Commissioner Timoney.  They do not want to live under the threat of arrest again.

On April 5, 2016, PPEHRC submitted a permit application, with the required fee, to the

City's Office of Special Events ("OSE").  On May 5, 2016, PPEHRC received a letter from the

OSE denying its request for a march permit.  The letter's explanation of why the permit was

being denied consisted solely of language excerpted from the Demonstration Policy:

> The Demonstration will substantially or unnecessarily interfere with traffic
> in the area contiguous to the activity, and will unreasonably disrupt
> movement or circulation of vehicular or pedestrian traffic (See Permit
> Policy for Demonstrations Section 7, Subsection B, Paragraph 7).
>
> The proposed Demonstration conflicts or interferes with a previously
> scheduled, annual, or otherwise regularly-held event or ceremony that is
> sponsored by or on behalf of the City or any other person or entity at the
> same City Property for the same date and time (See Permit Policy for
> Demonstrations Section 7, Subsection B, Paragraph 4).

Letter from Jazelle M. Jones, Deputy Managing Director/Director of Operations, City of

Philadelphia, Office of the Managing Director, Office of Special Events, to Cheri Honkala, Poor

People's Economic Human Rights Campaign, May 5, 2016 (attached as Exhibit A).

Through subsequent communications with the City Law Department, PPEHRC's counsel

learned that the City had decided to refuse all applications for marches on Broad Street during

the DNC, and that the OSE had an unwritten policy that it would refuse all applications for

marches anywhere in "Center City" during the hours of 7 AM to 9 AM and 3 PM to 6 PM on

weekdays, which the OSE calls "rush hour."  After objection from PPEHRC's counsel and

others, the City announced that it would allow some marches on Broad Street, but held firm to

the ban on afternoon marches in "Center City" starting at 3 PM.

The City claims that it needs to ban demonstrations for half the afternoon in order to "minimize disruption" and nonspecific "traffic and public safety hazards."  In response to a demand from PPEHRC's counsel that the City allow marches during rush hour, the City Solicitor responded:

> We expect that there will be high levels of traffic congestion during the Convention at rush hour.  Allowing a protest to tie up City streets during rush hour, particularly during the Convention, is unacceptable and presents traffic and public safety hazards.  We seek to minimize disruption to the lives of our residents, commuters and business owners .…  In addition, during this time of peak traffic congestion, we need to keep streets as clear as we can to allow police, fire and emergency medical services to respond to service calls.

Letter from Sozi Tulante, City Solicitor, to Reggie Shuford and Mary Catherine Roper, ACLU of Pennsylvania, June 17, 2016 (attached as Exhibit B).

The City has not defined "Center City" for purposes of its afternoon ban on street protests.  In separate City regulations, "Center City" is defined in various ways, generally encompassing all City blocks from the Schuylkill River to the Delaware River, as far north as Vine or Spring Garden Streets and as far south as South or Bainbridge Streets.  *See, e.g.,* Phila., PA. Code § 9-204 (1)(b) ("The area bounded by the north side of Vine street, the south side of Bainbridge street, and the Delaware and Schuylkill Rivers."); Phila., PA. Code § 9-402(1)(b) ("The area bounded by Spring Garden street, Bainbridge street, and the Schuylkill and Delaware Rivers.").  This area encompasses approximately four square miles.

Without the ability to march in the streets, protesters will be limited to a single venue near the DNC-related events in Center City that is capable of holding over 1,000 people, Thomas

Paine Plaza.[1]   Thomas Paine Plaza is raised above street level, making activities there difficult to

see or hear from the pathways that the delegates and others will use to attend events at the

Pennsylvania Convention Center and other Center City venues.  The City's ban on "rush hour"

protest marches will mean that during prime visibility hours, mass protest will be invisible to the

delegates and to the largest concentration of people who live and work in the City of

Philadelphia.

### The City's Policy of Permitting Non-Political Street Closures in Center City During the Morning and Late Afternoon Hours When it Will not Permit Marches

In contrast to its ban on Center City street protests between the hours of 7 AM to 9 AM

and between 3 PM and 6 PM, the City routinely authorizes extended street closures on Center

City streets during this time on weekdays.  The OSE's own website lists many examples of

authorized Center City street closures that extended into "rush hour" from just the past few

months.  Very frequently small streets (that nonetheless are sufficiently central to see heavy

traffic during rush hour) are closed for five hours or more to allow for block parties sponsored by

restaurants and bars:

- Wednesday, May 4, 2016: closure of Filbert Street from 11th to 12th Streets from 5:30 PM until 2 AM for the Field House Block Party.  *See* Exhibit C at 1.
- Thursday, May 5, 2016: closure of "Bach Place" [a.k.a. Manning Street] from Broad to 15th Street from noon to midnight for a Cinco de Mayo celebration sponsored by Jose Pistola restaurant.  *See* Exhibit C at 1.
- Thursday, May 5, 2016: closure of Ranstead Street from 20th to 21st Streets from 8 AM to 11 PM for a Cinco de Mayo celebration sponsored by Starr Restaurants.  *See* Exhibit C at 1.
- Monday, June 6, 2016: closure of "Bach Place" [a.k.a. Manning Street] from Broad to 15th Street from 2 AM to midnight for Jose Pistola's Annual Homebrew Challenge.  *See* Exhibit D at 6.

---

[1]      The other two Center City locations that the City makes available for large gatherings are unavailable: "Love Park" because it is under construction and Dilworth Plaza because it is booked through the week with DNC sponsored or related events.

- Tuesday, June 7, 2016: closure of Filbert Street from 11th to 12th Streets from 2 PM to 8 PM for a "private event."  *See* Exhibit D at 6.

- Friday, June 10, 2016: closure of Filbert Street from 11th to 12th Streets from 6 PM to midnight for a soccer-related pep rally.  *See* Exhibit D at 7.

- Tuesday, June 21, 2016: closure of Filbert Street from 11th to 12th Streets from 4 PM to 9 PM for the National Conference for Student Assessment.  *See* Exhibit D at 11.

But the City also authorizes closures of primary streets during the hours it will not permit marches on those streets:

- Thursday, June 23, 2016: closure of 12th Street from Callowhill to Spring Garden, 13th Street from Callowhill to Spring Garden, Noble Street from 11th Street to Broad, Hamilton Street from 11th Street to Broad, and Bottonwood Street from Ridge Avenue to Broad from 2 PM to midnight for the Callowhill Night Market.  *See* Exhibit D at 11-12.

- Friday, June 10, 2016: closure of Locust Street from 12th to 13th, 13th Street from Spruce to Locust, and 12th Street from Spruce to Locust from 4 PM to 11:30 PM for the Pride Day Weekend Kickoff Party.  *See* Exhibit D at 7.

- Thursday, April 14, 2016: closure of Locust Street from 13th Street to Broad from 9 AM until 3:30 PM for Action AIDS Dining Out for Life.  *See* Exhibit E at 2.

- Friday, May 20, 2016: closure of 25th Street from South to Naudain Streets from 4 PM to 11 PM for the Philadelphia School Annual Fundraiser.  *See* Exhibit C at 5-6.

And, in an action that functioned exactly the way a protest march would, the City authorized a rolling closure of multiple Center City Streets during the morning rush hour on the Tuesday, June 14, 2016, for a 5K run that began at 12th and Market at 8:30 AM and wound through a half dozen Center City Streets.  *See* Exhibit D at 17; Exhibit F.[2]  In the same way, the City closed several blocks of Market Street and 15th Street, beginning at 11 AM and lasting into the late afternoon on Friday, April 8, 2016 for a Parade and Rally at Dilworth Park to celebrate

---

[2] Although a note at the bottom of the race route ("*Sidewalk use only") seems to suggest that the runners would race on the sidewalks through the crush of people heading to work (*see* Exhibit F), the race is listed on the City's webpage for street closures, which specifies that the "Whole Road" would be closed (*see* Exhibit D at 17).

the Villanova Wildcats' victory in the NCAA basketball

http://www.phila.gov/InformationCenters Championship.  *See* Exhibit G.  The westernmost road

closures opened as the parade arrived at City Hall, but the City warned that vehicles might not be

able to exit garages along the parade route until after 4 PM.  *See* Exhibit G.  And, of course, the

City closed a far greater area in Center City to traffic from Friday, September 24 through

Monday, September 28, 2015 for the World Meeting of Families and "[Pope] Francis Festival."

*See* World Meeting of Families Fact Sheet,

/pope/Documents/UpdatedWORLDMEETINGFAMILIESFACTSHEET.pdf (attached as Exhibit

I);   Event Diagram, World Meeting of Families 2015,

http://www.phila.gov/InformationCenters/pope/Documents/dailymaps.pdf (attached as Exhibit

J).

     Many of these City-authorized street closures lasted 4 hours or longer, whereas a march

allows for the gradual closing and reopening of the street as the group moves.

### The City's Use of Alternative Measures to Protect its Interests in Traffic Flow and Safety that Burden Substantially Less Speech

     The City has a longstanding custom of allowing large street protests without a permit,

including on Center City streets between 3 PM and 6 PM.  The Philadelphia police routinely

direct such demonstrations to follow the flow of traffic, closing off the street to traffic and then

reopening it as the march proceeds.  The marches stop at traffic lights to allow cross traffic to

proceed, as well.  As an illustration, the City granted a permit to the "Fight for $15" campaign to

allow 1,000 people to march on Thursday, April 14, 2016 from 5:30 PM to 7 PM on Broad Street

from Cecil B. Moore Avenue to Arch Street.  *See* Exhibit K.  That permit purported to restrict

the march to the "PUBLIC SIDEWALKS ONLY."  *Id.*  However, police allowed the protesters

to occupy the streets and did not attempt to enforce the permit's restriction to sidewalks.  *See* Exhibit L.

After discovery, PPEHRC will present additional evidence from the City's own records and personnel to prove this well-established custom.  But PPEHRC does not want to march without a permit.  Because the City will not commit to allowing such marches and because the City has tried to prevent PPEHRC's march on various grounds, PPEHRC is concerned that the City will stop the march, or arrest or cite its participants.  PPEHRC's members and supporters include many poor people who cannot afford to be detained away from their families, to defend a criminal charge, or even to pay the new civil penalty the City plans to implement for "obstruction of the highways," "disorderly conduct," and "failure to disperse" during the DNC.

PPEHRC's proposed march would leave City Hall at 3 PM, and most of the projected 500 marchers would likely be south of South Street —and out of Center City traffic congestion—by 4 PM.  PPEHRC seeks to march on Broad Street, with the flow of traffic.  The City could restrict PPEHRC's marchers to the southbound lanes (or even two of the three southbound lanes), as it did when PPEHRC held the same march on the opening day of the Republican National Convention in Philadelphia in 2000.  The march could stop at traffic lights to permit cross-traffic.  If the City wanted to guarantee the most lanes for potential emergency traffic, it could ban parking (including valet parking) along Broad Street for the afternoon, as it does frequently for other events.

## IV. ARGUMENT

This Court must weigh four factors to determine whether a preliminary injunction should be issued:

(1)     the likelihood that the moving party will succeed on the merits;

(2)     the extent to which the moving party will suffer irreparable harm without injunction relief;

(3)     the extent to which the moving party will suffer irreparable harm if the injunction is issued; and

(4)     the public interest.

*Liberty Lincoln-Mercury Inc. v. Ford Motor Co.*, 562 F.3d 553, 556 (3d Cir. 2009); *McNeil Nutritionals LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 356-57 (3d Cir. 2007).  The balance of factors in this First Amendment case clearly weighs in favor of granting the requested relief.

### A.     PPEHRC IS LIKELY TO PREVAIL ON THE MERITS OF ITS FIRST AMENDMENT CLAIM

#### 1.     Defendant Bears the Burden of Proof and Persuasion in this First Amendment Case.

Unlike in most legal disputes, in First Amendment cases the *Defendant* carries the burden of proof and persuasion.  *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.") (citations omitted); *McTernan v. City of York,* 564 F.3d 636, 652 (3d Cir. 2009); *Phillips v. Borough of Keyport*, 107 F.3d 164, 172-73 (3d Cir. 1997) (en banc).  In other words, once PPEHRC has shown a restraint on free expression, the burden shifts to the City both to articulate the reasons for the restraint and to justify the restraint under the relevant First Amendment standard.  *Phillips*, 107 F.3d at 172-73 (government "carries the

burden of production and persuasion, not the plaintiffs"). Strict scrutiny applies in this case, but even if the Court were to apply intermediate scrutiny, the City cannot satisfy its burden.

> **2.** **The City's Temporal Protest Ban Cannot Be Justified Under any Applicable First Amendment Standard.**

In "public places historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, the government's ability to permissibly restrict expressive conduct is extremely limited . . . ." *United States v. Grace*, 461 U.S. 171, 177 (1983). The government, of course, may impose reasonable restrictions on the time, place, or manner of speech in a traditional public forum. But the City must show that the restrictions "[a] are justified without reference to the content of the speech, [b] that they are narrowly tailored to serve a significant governmental interest, and [c] that they leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Here, the City fails to meet each of the three prongs of the *Ward* test.

> **a.** **Ban Is Not Content Neutral**

First, the City's blanket rule against marches on streets in Center City from 7 AM to 9 AM and from 3 PM to 6 PM on weekdays cannot be viewed as content neutral in light of the innumerable other activities for which the City has closed streets in Center City during the same hours. The City routinely authorizes *extended* street closures on Center City streets during this time on weekdays, which are a far greater obstruction of traffic than a march, which requires only a rolling street closure.

The City has not explained why it will allow Center City streets to be closed for hours or days for all of the purposes listed above but cannot allow a moving protest on any Center City street from the hours of 3 PM to 6 PM. The City's decision to allow other street closures but not to allow First Amendment political activities in the same streets during the same time can be

explained by the City's favoring the block parties and other celebrations over Plaintiff's more critical message—which would constitute viewpoint discrimination—or its favoring commercial or prestigious speakers over those less powerful.  Either rationale is content-based and prohibited by the First Amendment.

"[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002) (internal quotation marks omitted). Such "[c]ontent-based prohibitions . . . have the constant potential to be a repressive force in the lives and thoughts of a free people."  *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 660 (2004).  The Supreme Court recently emphasized—and the Court of appeals for the Third Circuit has reiterated—that government regulation need not identify disfavored subjects to be content-based:

> In *Reed* [*v. Town of Gilbert*, ⸺ U.S. ⸺, 135 S.Ct. 2218, 2226 (2015)], the Supreme Court held that a town code governing the manner of display of outdoor signs that distinguished between ideological, political, and directional signs was an impermissible content-based restriction on speech.  In reaching that conclusion, the Court defined content-based laws as "those that target speech based on its communicative content . . . ."  *Reed*, 135 S.Ct. at 2226.  Of relevance here, the Court identified a "subtle" way in which statutes can, on their face, discriminate based upon content, namely by "defining regulated speech by its function or purpose."  *Id*. at 2227.

*Bruni v. City of Pittsburgh*, No. 15-1755, 2016 WL 3083776, at *7 (3d Cir. June 1, 2016).  Under *Reed*, the City's decision to approve road closures for commercial and celebratory events while refusing to approve road closures for political speech is content discrimination based on the purpose of the speech.

And it is a form of content discrimination that upends the priorities established through decades of First Amendment jurisprudence.  Political expression on governmental affairs and

public issues "has always rested on the highest rung of the hierarchy of First Amendment values." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (quoting *Carey v. Brown*, 447 U.S. 455, 467 (1980)).  *See also Boos v. Barry*, 485 U.S. 312, 318 (1988) (citations omitted); *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) ("There is a 'profound national commitment' to the principle that "debate on public issues should be uninhibited, robust, and wide-open").  *See Bruni*, 2016 WL 3083776, at *2 ("The speech at issue is core political speech entitled to the maximum protection afforded by the First Amendment  . . . .").  Favoring non-political speech, even commercial speech, over political expression stands the First Amendment hierarchy on its head and cannot be justified under the First Amendment.[3]

Content-based restrictions on speech are "presumptively unconstitutional and may be justified only if the government proves that [they are] narrowly tailored to serve compelling state interests."  *Reed*, 135 S. Ct. at 2226.  The City has not offered, and cannot offer, a compelling interest in refusing to permit street marches on Center City streets between 3 PM and 6 PM when it will permit street closures for other reasons.[4]  Even if the City's temporal protest ban were

---

[3]    "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs."  *Mills v. Alabama*, 384 U.S. 214, 218 (1966).  "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government."  *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964); *see also Eu v. San Francisco Cty. Democratic Central Comm.*, 489 U.S. 214, 223 (1989) (noting that "the First Amendment 'has its fullest and most urgent application'" to political speech).

[4]    At minimum, the City's approach to use of the streets during the late afternoon is arbitrary, and "a government regulation that allows arbitrary application is 'inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.'"  *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (quoting *Heffron v. Int'l Society for Krishna*, 452 U.S. 640, 649 (1981)).

viewed as content neutral, however, the City cannot demonstrate that its policy is narrowly tailored to serve a significant government interest.

### b. Ban Is Not Narrowly Tailored to Serve a Significant Government Interest

In applying the intermediate scrutiny test, the government bears the burden of demonstrating both that its recited harms are "real, not merely conjectural," and that the regulation "does not burden substantially more speech than is necessary to further the government's legitimate interests." *Phillips v. Borough of Keyport*, 107 F.3d 164, 175 (3d Cir. 1997) (quoting *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622 (1994) (Kennedy, J., concurring)); *U.S. Sound & Service v. Twp. of Brick*, 126 F.3d 555, 559 (3d Cir. 1997) (under intermediate scrutiny test, government bore the burden of coming forward with *facts* that would support a conclusion that the resolution was narrowly drawn to serve its interest).

Earlier this month, the Court of Appeals for the Third Circuit explained that this test requires the government to "demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *Bruni*, 2016 WL 3083776, at *10.

> Although "we must accord a measure of deference" to the government's judgment, *Hill*, 530 U.S. at 727, 120 S.Ct. 2480, as in *McCullen*, "it is not enough for [the City] simply to say that other approaches have not worked." 134 S.Ct. at 2540. We recognize that the City need not employ "the least restrictive or least intrusive means of serving its interests," *Ward*, 491 U.S. at 798, 109 S.Ct. 2746, but it must, in some meaningful way, "demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests," *McCullen*, 134 S.Ct. at 2540 . . . .
>
> By that statement, we do not suggest that the City must demonstrate that it has used the least-restrictive alternative, nor do we propose that the City demonstrate it has tried or considered *every* less burdensome alternative to its Ordinance. *See Ward*, 491 U.S. at 800, 109 S.Ct. 2746 (concluding that "[t]he Court of Appeals erred in sifting through all the available or imagined alternative means of regulating sound volume in order to determine whether the city's solution was the

least intrusive means of achieving the desired end" (internal quotation marks
omitted)).  On the contrary, analysis under intermediate scrutiny affords some
deference to a municipality's judgment in adopting a content-neutral restriction on
speech.  But the municipality may not forego a range of alternatives—which
would burden substantially less expression than a blanket prohibition on
Plaintiffs' speech in a historically-public forum—without a meaningful record
demonstrating that those options would fail to alleviate the problems meant to be
addressed.

*Bruni*, 2016 WL 3083776, at *11-12.

The City's blanket policy against any marches in the ill-defined "Center City"—which

encompasses approximately four square miles—for five hours out of every work day is the

antithesis of "narrow tailoring,"  The City claims that it needs to ban demonstrations for half the

afternoon in order to "minimize disruption" and nonspecific "traffic and public safety hazards."

While preventing undue interference with traffic has been acknowledged as an "important

government interest," minimizing inconvenience and sanitizing Center City for the benefit of

DNC delegates are not such interests.  The City cannot ban protest marches in a four mile zone

for half the afternoon simply to avoid any potential slowdown in traffic.  The City must

demonstrate, instead, that any temporary use of any street in Center City for protest during the

hours of 3 PM to 6 PM would create "real, not merely conjectural" hazards.  Merely to state such

a proposition is to expose its absurdity, particularly in light of the City's history of allowing

street closures in Center City between 3 PM and 6 PM.

Whatever its argument for the need to avoid traffic congestion, the City simply cannot

meet the standard emphasized in *Bruni*: the City cannot demonstrate that its alternative methods

for managing traffic and safety for unpermitted marches could not be applied to permitted

marches.  Indeed, PPEHRC's proposed march is a perfect illustration of the efficacy of these

alternatives to banning marches on Center City streets.  PPEHRC has asked to leave City Hall at

3 PM to walk south to the Wells Fargo Center.  Most of the projected 500 marchers would likely

be south of South Street—and out of Center City traffic congestion—by 4 PM.  The PPEHRC seeks to march on Broad Street, with the flow of traffic, which is the street most able to accommodate a large group of protesters.  The City could easily accommodate the march without shutting down all of Broad Street traffic by allowing the marchers to use only the southbound lanes (or even two of the three southbound lanes), as it did when PPEHRC held the same march on the opening day of the Republican National Convention in Philadelphia in 2000, and by requiring marchers to stop at traffic lights to permit cross-traffic.  If the City wanted to guarantee the most lanes for potential emergency traffic, it could ban parking (including valet parking) along Broad Street for the afternoon, as it does frequently for other events.  In short, the City need not prohibit PPEHRC's march to keep Broad Street available for traffic.

The same reasoning prompted the United States District Court for the Northern District of Ohio, this week, to enjoin broadly drawn limits on protest announced for the Republican National Convention to take place in Cleveland the week before the DNC.  *See Citizens for Trump v. City of Cleveland*, No. 1:16-cv-01465-JG, Transcript of Proceedings at 61:2-11 (N.D. Ohio June 23, 2016) ("And I really am guided in this by the Supreme Court's opinion in the Massachusetts abortion access case, where Chief Justice Roberts writing for the Court dealt with the issue of the sufficient correlation between the governmental interest and the restrictions, and found that the government must demonstrate that the alternative measures that burden substantially less would fail to achieve the government's interest. The government must not simply show that the government's chosen route is the easier one.") (attached as Exhibit M).

### c.    No Alternative Channels of Communication

Without the ability to march in the streets, PPEHRC and other large protest groups will be rendered virtually invisible to their key audience: the delegates and others who will visit the

City for the DNC.  PPEHRC's alternatives are to rally at Thomas Paine Plaza, which does not

offer anywhere near the same visibility as a march on Broad Street; to rally in a park or other

venue even less visible to the delegates and others associated with the DNC; or to march at a

time of day when the delegates and other visitors are either busy in meetings or sequestered in

the well-isolated Wells Fargo Center.

  None of these alternatives come close to conveying the message that PPEHRC will

convey by marching down Broad Street to the DNC for the opening of the Convention.  One of

the points that PPEHRC seeks to make clear is the connection between local poverty and

national policies, a point that is uniquely conveyed by marching from City Hall to the site of the

DNC.  That is a message that PPEHRC is entitled to convey.  *See, e.g., Schneider v. New Jersey*,

308 U.S. 147, 163 (1939) ("[O]ne is not to have the exercise of his liberty of expression in

appropriate places abridged on the plea that it may be exercised in some other place."); *Wolin v.

Port of N.Y. Authority*, 392 F.2d 83, 90 (2d Cir. 1968) ("The propriety of a place for use as a

public forum [turns] on the relevance of the premises to the protest . . . . In some situations the

place represents the object of protest, the seat of authority against which the protest is directed.

In other situations, the place is where the relevant audience may be.") (citations omitted);

*Nationalist Movement v. City of Boston*, 12 F. Supp. 2d 182, 192 (D. Mass. 1998) ("To change

the location, however, was to change the character of the message. . . .  The *place* of the event

was a substantive feature of the message."); *Courtemanche v. Gen'l Serv. Administration*, 172 F.

Supp. 2d 251, 275 (D. Mass. 2001) (same).

  The timing and specific route of PPEHRC's march are also significant.  PPEHRC's

planned march intentionally replicates the march it held on the first day of the 2000 Republican

National Convention.  Indeed, PPEHRC has travelled to national party conventions in the

intervening sixteen years, in order to highlight their message that the poor remain poor, no matter which party is in power.  PPEHRC marches before the opening of the first day of each convention so that working people can join their march, so that working people will see their march, and because that is the time that the news media are present in the greatest numbers but have the least to report from the convention itself.

The City's ban on "rush hour" protest marches in Center City, where PPEHRC's intended audience is located, does not leave open any remotely comparable alternative avenue of communication.

**B.    PLAINTIFF WILL SUFFER IRREPARABLE HARM IF THE COURT DECLINES TO ISSUE THE INJUNCTION**

As the Supreme Court has noted, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (emphasis added); *American Civil Liberties Union v. Reno*, 217 F.3d 162, 180 (3d Cir. 2002) (generally in First Amendment challenges plaintiffs who meet the merits prong of the test for a preliminary injunction "will almost certainly meet the second, since irreparable injury normally arises out of the deprivation of speech rights.") (citation omitted); *Abu-Jamal v. Price*, 154 F.3d 128, 135–36 (3d Cir. 1998) (same).  In this case, absent a preliminary injunction, the City will prohibit PPEHRC's march.  PPEHRC will then be faced with the choice of foregoing its important political speech, or exercising its rights under threat of interference or even arrest.

**C.    THE CITY WILL SUFFER NO IRREPARABLE HARM IF THIS INJUNCTION ISSUES**

The requested order will not prejudice the City's ability to avoid the "traffic and public safety hazards" that are its stated reasons for the ban on late afternoon marches.  At most, the

City might have to make accommodations on a rolling basis, similar to those it has made before, to enable Broad Street to serve a dual function. But such accommodations, if necessary, do not constitute irreparable harm. PPEHRC's march will be smaller in size and shorter in duration than many events that take place regularly on Broad Street.

**D.      GRANTING THE INJUNCTION WILL SERVE THE PUBLIC INTEREST**

The nominating convention of one of our country's two major political parties is an unparalleled opportunity for the public to engage in and with the democratic process. As the delegates to the convention discuss the Party's official platform on income inequality, police-community relations, banking regulation, global warming, and every other major issue of the day, the same debates will be occurring in the City's streets. The First Amendment safeguards this time-honored use of our streets. "[S]treets and parks . . . have immemorially been held in trust for the use of the public . . . for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens." *Hague v. CIO*, 307 U.S. 496, 515-16 (1939). "[T]he streets and sidewalks of Philadelphia [are] an undisputed quintessential public forum." *Starzell v. City of Philadelphia*, 533 F.3d 183, 196 (3d Cir. 2008).

The public's interest is served by respecting the democratic process—both the formal process occurring inside the Wells Fargo Center and the informal democratic process to which our streets are dedicated. *See Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 883-84 (3d Cir. 1997) ("In the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights . . . .").

This being a non-commercial case involving purely injunctive relief, and the balance of hardships favoring the Plaintiff, the Fed. R. Civ. P. 65(c) security bond requirement should be

waived.  *See Elliot v. Kiesewetter*, 98 F.3d 47, 59-60 (3d Cir. 1996); *Temple University v. White*, 941 F.2d 201, 219-20 (3d Cir. 1991).

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that this Court issue the requested injunction.

Dated: June 24, 2016.                                   Respectfully submitted,

*/s/ Mary Catherine Roper*
MARY CATHERINE ROPER
PA Id. No. 71107
MOLLY TACK-HOOPER
PA Id. No. 307828
ACLU of Pennsylvania
P.O. Box 60173
Philadelphia, PA 19102
Tel: (215) 592-1513 ext. 116
Fax: (215) 592-1343
mroper@aclupa.org
mtack-hooper@aclupa.org

SETH F. KREIMER
3400 Chestnut St.
Philadelphia, PA 19104
Tel.: (215) 898-7447
Fax: (215) 573-2025
skreimer@law.upenn.edu

*Counsel for Plaintiff*